UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DAVID H. LANE, JR.,

Plaintiff,

v.

DR. MICHAEL PERSON,

Defendant.

CAUSE NO. 3:19-CV-259-RLM-MGG

OPINION AND ORDER

Plaintiff David H. Lane, Jr., a prisoner without a lawyer, was granted leave to proceed on a claim against defendant Dr. Michael Person in his individual capacity for failing to provide him with adequate medical care for his brain tumor, while housed at the LaPorte County Jail. On July 20, 2020, Dr. Person filed a motion for summary judgment. Mr. Lane received a notice, as required by N.D. Ind. L.R. 56-1(f), notifying him of the consequences of failing to respond to Dr. Person's motion. On August 3, 2020, Mr. Lane responded to Dr. Person's motion. On August 13, 2020, Dr. Person filed a reply. On August 19, 2020, Mr. Lane filed a sur-reply and motion to dismiss Dr. Person's motion for summary judgment. Mr. Lane also filed two motions for sanctions against Dr. Person and his counsel. The summary judgment motion and motions for sanctions are now ripe for decision.

# I.   FACTS

## A. LaPorte County Jail

Mr. Lane was booked into the LaPorte County Jail on March 8, 2017. He told jail officers during his processing that he had a brain tumor, knee tumor, degenerative joint disease, tinnitus, bloody stools, a medical marijuana prescription, and thoughts of self-harm. He was placed in suicide gear in a safety cell and referred to the jail's mental health staff for an evaluation.

The events relevant in this case took place between March 8, 2017 and April 2019. This opinion recounts them in the order in which they happened.

### 1. Medical Treatment in 2017

On March 14, 2017, Mr. Lane was scheduled to be seen by a medical provider regarding his concerns about his brain tumor. Nine days later, on March 23, Dr. Michael Mitcheff, a jail physician employed with Advanced Correctional Healthcare, Inc.[1], saw Mr. Lane. Mr. Lane reported he was diagnosed with a brain tumor in 1997 and was having headaches. Mr. Lane's pupils were equal, round, and reactive to light, and his extraocular movements were intact. He had no facial droop and his tongue was midline. These findings indicated a normal neurological exam. Dr. Mitcheff noted that he needed Mr. Lane's medical records to evaluate and assess the brain tumor's seriousness.

---

[1] Advanced Correctional Healthcare, Inc. is a company that provided physicians for county jails throughout Indiana.

After Mr. Lane disclosed he had a brain tumor, the jail's medical staff contacted the medical providers who had treated Mr. Lane's tumor to obtain his medical records. Mr. Lane had been treated at the Niles Community Health Center and the University of Michigan Otolaryngology Clinic and Neurosurgery Clinic. The jail received the medical records from these institutions in late March 2017, and Dr. Person reviewed them in early April 2017. The records showed that Mr. Lane's "tumor" was actually an acoustic neuroma that Mr. Lane reported having as far back as 1997. An acoustic neuroma, also called a vestibular schwannoma, is a benign, or non-cancerous, tumor that develops on the nerves of the inner ear and can affect hearing and balance.

The medical records from the Niles Community Health Center showed that, in November 2015, a physician from that institution ordered an MRI of Mr. Lane's brain and referred him to an ENT specialist after Mr. Lane complained of continued hearing loss on his right side. The MRI showed that Mr. Lane's acoustic neuroma measured 10 x 9 x 8 millimeters in size. Additional medical records received from the University of Michigan Otolaryngology Clinic documented that Dr. Hussam El-Kashlan, an otolaryngologist, met with Mr. Lane in March 2016 to evaluate his acoustic neuroma. Dr. El-Kashlan reviewed Mr. Lane's December 2015 MRI and noted it showed an "approximately 10-11 m[illimeter] mass within the right cerebellopontine angle extending minimally into the medial internal auditory canal." Dr. El-Kashlan discussed Mr. Lane's diagnosis with him along with treatment options, which included observation, radiation, and surgical resection. Dr. El-

Kashlan explained the risks associated with the surgical options and various approaches and indicated he would refer Mr. Lane for a neurosurgery consultation and additional testing. Mr. Lane never followed through with any of Dr. El-Kashlan's recommended treatment.

Dr. Person didn't issue new medical orders after reviewing the medical records because Mr. Lane's tumor was benign and had been present for a long time. There was also no indication in the records that Mr. Lane had complained of any hearing loss or issues with his gait or balance. There was no treatment plan to indicate the tumor should be removed and no physician had recommended that Mr. Lane have surgery. And no documentation suggested that Mr. Lane had been scheduled for surgery before being incarcerated at the LaPorte County Jail.

On April 14, 2017, Dr. Person examined Mr. Lane with regard to his acoustic neuroma. Mr. Lane complained of dizziness, tinnitus, and hearing loss. He said he wanted to have surgery to remove the tumor. Dr. Person determined that Mr. Lane didn't need surgery because the acoustic neuroma hadn't enlarged and there had been no recommendation for surgery during the past twenty years. Instead, Dr. Person believed the tumor could safely be monitored. Dr. Person decided to confirm his treatment plan with Dr. Mitcheff because an acoustic neuroma isn't a condition he typically encountered in his practice as a primary care physician. In consultation with Dr. Mitcheff, Dr. Person ordered an MRI to find out if there had been a change in the size of Mr. Lane's tumor since his last MRI. He also referred Mr. Lane for an ENT consultation and to evaluate his hearing.

Five days later, Mr. Lane had an MRI of his brain at LaPorte Hospital. The MRI showed a right internal auditory canal nodule consistent with an acoustic neuroma that measured 13 millimeters x 9 millimeters x 9 millimeters. The acoustic neuroma hadn't significantly changed in size since Mr. Lane's March 2012 MRI. Dr. Person decided that, because there had been little change in Mr. Lane's acoustic neuroma during the last five years, surgical intervention wasn't warranted.

On May 31, 2017, Mr. Lane saw Dr. Neil Wangstrom, an ENT specialist, for a consultation and audiology testing. Mr. Lane complained that his ears were ringing, and he felt like his tinnitus was worsening along with his headaches. He indicated his drooling had increased and he felt as if his tumor was growing. Dr. Wangstrom reviewed Mr. Lane's MRI studies and noted the size of his tumor hadn't changed since 2012. Dr. Wangstrom discussed his findings with Mr. Lane and expressed his concern that, in 2016, Mr. Lane's previous providers at the University of Michigan Otolaryngology Clinic and Neurosurgery Clinic had discussed the possibility of a resection of Mr. Lane's tumor even though there was no growth in the tumor and surgery could make his symptoms worse. Dr. Wangstrom referred Mr. Lane to a specialist neurotology (a subspecialty of otolaryngology) at Indiana University Health Hospital for a second opinion and recommended a follow-up MRI in six months.

Dr. Person saw Mr. Lane on June 5, 2017 for a follow-up visit regarding his acoustic neuroma. Dr. Person tried to discuss Dr. Wangstrom's treatment options with Mr. Lane, but once Mr. Lane learned surgery wasn't an option he became belligerent and had to be escorted out of the exam room. Dr. Person didn't recommend

surgery because Dr. Wangstrom agreed that surgery wasn't necessary. He told Mr. Lane that he wouldn't continue to see him for this issue but would treat any other acute problems that might arise.

Dr. Person and the jail's nursing staff treated Mr. Lane in June and July 2017. Mr. Lane submitted a kiosk request to medical staff on June 15, 2017 complaining of headaches. Nurse Bartz prescribed Tylenol for thirty days, but Mr. Lane told her he needed "Vicodin" or "Perc." The nursing staff consulted with Dr. Person on July 5, 2017 after Mr. Lane complained of frequent headaches, and knee and back pain. Dr. Person prescribed 500 milligrams of Tylenol for five days for Mr. Lane's pain. The nursing staff contacted Dr. Person on July 25, 2017 to report that Mr. Lane's hand was swollen and discolored. Dr. Person ordered that Mr. Lane be transported to the hospital. After a negative work-up at the hospital, Mr. Lane returned to the jail in stable condition.

Dr. Person examined Mr. Lane on August 21, 2017 for complaints of back pain. Mr. Lane said he couldn't get comfortable and he had experienced pain for years. Upon examination, Mr. Lane had tenderness in his spine, but he stood and sat without visible discomfort. Dr. Person assessed Mr. Lane with chronic lumbar back pain that was functional without definable limitations in activity. He prescribed 1,000 milligrams of Tylenol for thirty days. On August 28, 2017, Dr. Person ordered another MRI of Mr. Lane's brain.

In September 2017, the jail's medical staff contacted the North Central Neurosurgery Group to arrange for a consultation about Mr. Lane's acoustic

neuroma. A neurosurgeon reviewed the April 2017 MRI of Mr. Lane's brain and indicated that surgery wasn't necessary and suggested Mr. Lane have a follow-up MRI in six months. Dr. Person had requested the consultation and, based on the neurosurgeon's recommendation, he decided that the appropriate treatment was to monitor Mr. Lane's tumor.

Mr. Lane had another MRI of his brain on September 7, 2017. That MRI showed his acoustic neuroma was stable in size when compared to his April 2017, MRI, but it was slightly smaller in size when compared to his study from April 2010. In mid-September, Dr. Person treated Mr. Lane in the jail's chronic care clinic for complaints of headaches. His condition was stable, and Dr. Person ordered a new prescription for Tylenol.

About a month later, on October 2, 2017, Dr. Person examined Mr. Lane because he complained of pain throughout his body, including his neck, back, groin, and head. Mr. Lane said Tylenol wasn't effective in controlling his pain and he should not have to be in pain as he was being held on false charges and the staff was "covering up" his need for surgery for his acoustic neuroma. Mr. Lane told Dr. Person he had been prescribed Baclofen, Neurontin, Percocet, and medical marijuana for his pain. Dr. Person found Mr. Lane's cranial nerves II-VII to be intact and noted that Mr. Lane could converse and hear normal tone conversations. Dr. Person assessed Mr. Lane as having chronic pain and continued the Tylenol prescription for another 120 days. Dr. Person noted that Mr. Lane's examination and current medical condition didn't warrant stronger pain medication.

On October 9, 2017, Dr. Person examined Mr. Lane at the request of the jail's administrative staff. Mr. Lane was very angry because he claimed someone told the judge in his criminal case that he didn't have a tumor. Dr. Person didn't know who had communicated that information to the criminal court. Mr. Lane was able to ambulate without difficulty and didn't show any balance issues, but he complained of a global headache. Dr. Person noted that Dr. Wangstrom, who had evaluated Mr. Lane's acoustic neuroma, didn't recommend surgery. Dr. Person assessed Mr. Lane as having headaches and a stable acoustic neuroma. His treatment plan entailed managing Mr. Lane's condition, including monitoring the size of his acoustic neuroma through serial MRI scans.

Dr. Person ordered a follow-up MRI of Mr. Lane's brain on October 30, 2017. That November 27, 2017 MRI showed his acoustic neuroma hadn't significantly changed in size since his April 2010 and September 2017, MRI studies.

### 2. Medical Treatment in 2018

On February 1, 2018, Mr. Lane requested a prescription for Elavil, a medication used to treat depression and chronic tension-type headaches, to help him sleep. About two weeks later, on February 13, 2018, Mr. Lane began taking Elavil. On February 26, 2018, Mr. Lane underwent another MRI of his brain at LaPorte Hospital. The MRI showed that his acoustic neuroma was stable in size and hadn't changed since his last MRI.

From March through July 2018, Mr. Lane received treatment for his headaches and acoustic neuroma. Dr. Mitcheff continued Mr. Lane's prescription for Elavil on March 11, 2018. About a month later, on April 16, 2018, the jail's nursing staff saw Mr. Lane for a follow-up visit for his headaches during which he requested stronger medication. Dr. Mitcheff continued Mr. Lane's prescription for Tylenol and indicated a follow-up MRI was needed. Dr. Person's June 14, 2018 notes document that he ordered another MRI for Mr. Lane. On June 26, 2018, Mr. Lane asked that his Elavil be increased, but Dr. Person wouldn't increase it because Mr. Lane hadn't reported any symptoms or change in his condition that would warrant an increase. From June 27, 2018 to July 1, 2018, and again on July 3, 2018, Mr. Lane refused to take his Elavil.

Mr. Lane had additional treatment for his acoustic neuroma in September and November 2018. First, on September 18, 2018, Mr. Lane underwent another MRI of his brain, which showed his acoustic neuroma hadn't significantly changed in size since his April 2010 and February 2018, MRI studies. Mr. Lane refused his November 13, 2018 chronic care clinic visit with Dr. Person, which had been scheduled to assess his many conditions.

### 3. Medical Treatment in 2019

Dr. Person provided Mr. Lane with medical treatment in early 2019 before Mr. Lane left LaPorte County Jail. Dr. Person observed on January 18, 2019 that Mr. Lane could ambulate without difficulty and his gait was steady. He voiced no

complaints of pain. On February 5, 2019, Mr. Lane once again refused his chronic care clinic visit with Dr. Person. Dr. Person stopped working as a physician at LaPorte County Jail in February 2019 and had no further involvement with Mr. Lane after that. Mr. Lane was transferred from LaPorte County Jail to the Indiana Department of Correction on April 25, 2019.

### B. Indiana Department of Correction

On August 21, 2019, Dr. Rick Nelson, a neurotologist who works for Indiana University Health Hospital, had an initial consultation with Mr. Lane about his acoustic neuroma. Mr. Lane reported he had undergone evaluations in 1997 and 2016 and had very poor hearing in his right ear along with tinnitus, and mild headaches. Dr. Nelson assessed Mr. Lane's acoustic neuroma as being small because it was less than 2.5 centimeters in size and discussed the various treatment options, which included observation, radiation, and surgery with Mr. Lane. Dr. Nelson presented surgery as an option because there had been a small growth of 1 to 1.5 millimeters in the tumor, which could be seen on Mr. Lane's 2019 MRI when compared to his most recent 2018 MRI study. He also noted that Mr. Lane's hearing had worsened slightly from his audiology tests in 2016. Mr. Lane indicated he was agreeable to having the surgery given that the tumor could continue to grow, which would result in continued hearing loss and increase the risk to his facial nerve.

Dr. Nelson surgically removed Mr. Lane's acoustic neuroma on October 11, 2019. The surgery was uneventful, and the pathology report indicated the tumor was

benign. Mr. Lane had a follow-up visit with Dr. Nelson on November 12, 2019. Dr. Nelson noted that Mr. Lane's incision was healing, his facial nerve function was normal, and some of his symptoms had improved. He recommended that Mr. Lane have a follow-up MRI in one year.

In reviewing Mr. Lane's medical history, Dr. Nelson opined that Dr. Person's medical treatment was appropriate and met the standard of care because he ordered five MRIs of Mr. Lane's brain and referred him to Dr. Wangstrom for an ENT consultation. Dr. Nelson indicated that it was appropriate for Dr. Person, as Mr. Lane's primary care physician, to rely on the results of the serial MRI studies and Dr. Wangstrom's judgment and expertise in determining the appropriate course of treatment for Mr. Lane's acoustic neuroma. Dr. Nelson said that, because Mr. Lane's MRIs showed his tumor was relatively stable, it was reasonable for Mr. Lane not to undergo surgery in 2017. He further opined, that while it was appropriate to surgically remove the tumor in 2019, there was no medical reason that indicated it should have been removed earlier. In Dr. Nelson's opinion, Mr. Lane did not suffer any actual damages from not having the surgery earlier and it is only possible he could have slightly less hearing loss.

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears

the initial responsibility of informing the district court of the basis for its motion and identifying" the evidence that "demonstrate[s] the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In ruling on a motion for summary judgment, the court must view all facts in the light most favorable to the nonmoving party. Anderson v. Liberty Lobby, 477 U.S. at 255. The court won't "make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." Payne v. Pauley, 337 F.3d 767, 770 (7th Cir. 2003). Summary judgment isn't a substitute for a trial on the merits or a vehicle for resolving factual disputes. Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994). Instead, the court's only task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." Payne v. Pauley, 337 F.3d at 770. Summary judgment can't be granted if a reasonable factfinder could find in favor of the nonmoving party. Id.

## III.   DISCUSSION

Dr. Person moves for summary judgment asserting that he rendered constitutionally appropriate medical care to Mr. Lane because the medical record and depositions establish that he routinely examined him, ordered five MRIs of his brain, and referred him to Dr. Wangstrom, an ENT specialist. Dr. Person also asserts he provided appropriate care to Mr. Lane by consulting with another physician, Dr. Mitcheff, who worked at LaPorte County Jail, and referring him to a neurosurgeon at the North Central Neurosurgery Group. Dr. Person says he didn't violate Mr. Lane's constitutional rights because he provided Mr. Lane with objectively reasonable medical care and his care satisfied the standard of care for treating his condition.

Mr. Lane asserts that Dr. Person's medical care was objectively unreasonable because Dr. El-Kashlan from the University of Michigan Otolaryngology Clinic recommended surgery for his acoustic neuroma and scheduled his surgery for June 2016. He says that while his June 2016 appointment had to be cancelled because of transportation issues, the surgery was rescheduled for August 2016; that appointment was also cancelled because his Medicaid was terminated. Mr. Lane next claims that he has witnesses who will testify Dr. Person had no intention of allowing his surgery to take place. Mr. Lane also asserts Dr. Person told jail staff that Mr. Lane was receiving treatment for his acoustic neuroma when, in fact, he didn't receive any treatment at the jail. He further asserts that summary judgment should be denied because the trial judge in his criminal case was given false medical records, which showed he did not have a tumor. Therefore, according to Mr. Lane, Dr. Person's

13

medical care was objectively unreasonable because he did not receive treatment for his acoustic neuroma, including the surgery that was scheduled before his arrival at the jail.

Mr. Lane's constitutional rights "as a pretrial detainee are derived from the Due Process Clause of the Fourteenth Amendment." Burton v. Downey, 805 F.3d 776, 784 (7th Cir. 2015). "[M]edical-care claims brought by pretrial detainees under the Fourteenth Amendment are subject only to the objective unreasonableness inquiry identified in Kingsley. Miranda v. Cty. of Lake, 900 F.3d 335, 352 (7th Cir. 2018) (citing Kingsley v. Hendrickson, 576 U.S. 389 (2015)). The court of appeals has explained that the inquiry for assessing a due process challenge to a pretrial detainee's medical care entails two steps. Id. at 353. The first step, which focuses on the defendant's intentional conduct, "asks whether the medical defendants acted purposefully, knowingly, or perhaps even recklessly when they considered the consequences of their handling of [the plaintiff's] case." Id. A showing of negligence or even gross negligence isn't enough. Id. The second step asks whether the challenged conduct was objectively reasonable. Id. at 354. This requires a court to "focus on the totality of facts and circumstances faced by the individual alleged to have provided inadequate medical care and to gauge objectively—without regard to any subjective belief held by the individual—whether the response was reasonable." McCann v. Ogle Cty., Ill., 909 F.3d 881, (7th Cir. 2018). The objective reasonableness standard requires more than medical malpractice and "the state-of-mind-

14

requirement for constitutional cases remains higher." <u>Miranda v. Cty. of Lake</u>, 900 F.3d at 353.

## A. Inadequate Medical Care Claim

As a threshold matter, Mr. Lane's response brief (ECF 93) and document titled "Motion to Dismiss Summary Judgment" (ECF 96), which the court construes as a supplemental response brief, are deficient and don't comply with the requirements of Federal Rule of Civil Procedure 56 or Northern District of Indiana Local Rule 56-1. Mr. Lane contends in his response brief and motion there are material facts that are genuinely disputed. He provides numbered paragraphs in support of this proposition, but none of these paragraphs contain citations to any evidence that supports his argument that material facts are genuinely in dispute. Mr. Lane can't create issues of material fact with statements that lack citations. Instead, he generally references the more than 2,500 pages of medical records and deposition testimony filed in this case and asks the court to review these materials for him. All litigants, even those without lawyers, must follow procedural rules. <u>McCurry v. Kenco Logistics Svcs., LLC</u>, 942 F.3d 783, 787 n.2 (7th Cir. 2019). It's not the court's job to search the medical records and deposition testimony to find support for the assertions that Mr. Lane makes in his response and motion. <u>United States v. Dunkel</u>, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

Still, the court will address the allegations Mr. Lane has presented in his response and motion. First, Mr. Lane assets that, during Dr. Nelson's May 26, 2020

deposition, defense counsel fraudulently and deceptively told Dr. Nelson that Dr. El-Kashlan from the University of Michigan Otolaryngology Clinic had recommended that his acoustic neuroma be treated through observation when, in fact, Dr. El-Kashlan had scheduled surgery to remove the tumor in June 2016. While Mr. Lane states that the June 2016, surgery had to be cancelled because he had transportation issues, he says it was rescheduled for August 2016. But he also acknowledges that the August 2016, surgery was cancelled because his Medicaid insurance was terminated.

The court has reviewed the extensive record in this case and can find no evidence to support Mr. Lane's assertion that he was scheduled for surgery in June and August 2016.[2] With respect to Mr. Lane's assertion that defense counsel misrepresented the record, Dr. Nelson's deposition testimony shows that he reviewed Dr. El-Kashlan's 2016 treatment notes independently of any statements made by defense counsel during the deposition. In sum, Mr. Lane hasn't produced any evidence to support his allegations that he was scheduled for surgery at any time in 2016 or that defense counsel intentionally misled Dr. Nelson during his deposition.

_____

[2] On October 23, 2020, the court granted Dr. Person's motion to compel and ordered Mr. Lane to produce emails he claimed proved he was scheduled to have surgery for his acoustic neuroma in 2016, including Dr. El-Kashlan's recommendation regarding the surgery. Mr. Lane didn't produce these emails or any documentation to show that he was scheduled to have surgery for his acoustic neuroma in 2016. Furthermore, the court has reviewed the medical records, including those from the University of Michigan Otolaryngology Clinic and Neurosurgery Clinic, and couldn't find any emails indicating that Mr. Lane was scheduled for surgery in 2016. Mr. Lane's medical records from the University of Michigan Neurosurgery Clinic show that he had routine appointments scheduled in April, May, June, and August 2016, but, for various reasons, he wasn't able to attend those appointments and had to cancel them.

Mr. Lane next contends that he has identified witnesses who are prepared to testify at trial. He first names Classification Officer Janice Wright, who he alleges will testify that Dr. Person had no intention of allowing him to have surgery because Dr. Person didn't want to pay for the surgery. Mr. Lane next identifies Captain Derek Allen as a witness who he claims will testify that Dr. Person told Captain Allen that Mr. Lane didn't need to be seen by a neurologist when he entered the jail in 2017. He has also named Captain Ott as a witness and states Captain Ott will testify that Dr. Person told Captain Ott that Mr. Lane was receiving treatment for his acoustic neuroma even though Dr. Person had not provided him with any treatment. Mr. Lane has also identified Sheriff John Boyd and Judge Thomas Alevizos as witnesses who will testify that his medical records had been falsified because they showed Mr. Lane didn't have a tumor. He has further named Dr. Roman Fillipowitz as a witness, who he claims will testify that Mr. Lane needed a specialist for his surgery in 2013. However, while Mr. Lane claims these witnesses will collectively establish that the allegations contained in his complaint are true and will show that Dr. Person refused to order the surgery he needed for his acoustic neuroma, he hasn't produced affidavits from these people or cite to materials in the record that support these witnesses' proffered statements. Because the alleged statements from these witnesses constitute hearsay, are unsupported in the record, and don't appear to be material to the issues in this case, the court won't consider them.[3]

---

[3] Mr. Lane's additional contentions also fall short. To the extent Mr. Lane claims there was an "interjail communication" between Dr. Person and Captain Allen indicating that he could not see a neurologist, Mr. Lane has not provided the court with this communication or cited to any evidence in the record to support his contention. Mr. Lane has also not produced evidence that

Mr. Lane is displeased with Dr. Person's decision to monitor his acoustic neuroma for the two years he was housed at the LaPorte County Jail, but the record leaves no room for any finding other than that Dr. Person's medical care was constitutionally adequate and objectively reasonable given the circumstances in this case. Dr. Person became Mr. Lane's primary care physician when Mr. Lane arrived at the jail in March 2017. In that role, he was responsible for prescribing treatment that was medically necessary for Mr. Lane. Dr. Person initially reviewed Mr. Lane's medical records and consulted with Dr. Mitcheff to develop a treatment plan for Mr. Lane's acoustic neuroma. In reviewing the medical records, Dr. Person noted that Mr. Lane had an acoustic neuroma since 1997, which caused hearing loss on his right side. He noted that, from 2010 to 2012, Mr. Lane's MRI scans showed his acoustic neuroma had not changed in size. In December 2015, Mr. Lane had another MRI scan, which showed his acoustic neuroma was stable and had not grown. Mr. Lane's medical records indicated that Dr. El-Kashlan evaluated the December 2015, MRI scan and assessed the tumor as being approximately ten to eleven millimeters in size. Dr. El-Kashlan's treatment notes indicated that he discussed various treatment options, including surgery, with Mr. Lane. He also referred Mr. Lane for a neurosurgery consultation and additional testing, but Mr. Lane never followed up on Dr. El-Kashlan's recommendations.

---

Dr. Person cancelled his medical insurance with the intent to deprive Mr. Lane of his surgery. Furthermore, the issue of Dr. Person's insurance isn't relevant to this matter and the court won't considered it.

While Mr. Lane was incarcerated at the jail, Dr. Person examined him and ordered repeat MRIs of his brain to assess his acoustic neuroma. In April 2017, Mr. Lane had another MRI of his brain, which showed that his acoustic neuroma hadn't significantly changed in size since 2012. In May 2017, Dr. Person referred Mr. Lane to Dr. Wangstrom for an ENT consultation, and Dr. Wangstrom confirmed that the acoustic neuroma hadn't changed in size since 2012 and didn't recommend surgery. In September 2017, a neurosurgeon at the North Central Neurosurgery Group reviewed Mr. Lane's MRIs and indicated surgery wasn't warranted. That same month, Mr. Lane had another MRI, which showed his acoustic neuroma was stable in size when compared to his April 2017 study, but it had also slightly reduced in size when compared to his April 2010 study.

After Mr. Lane was seen by Dr. Wangstrom, Dr. Person continued to monitor Mr. Lane's acoustic neuroma through additional MRI scans. Mr. Lane had scans again in November 2017, February 2018, and September 2018 that showed his tumor was relatively stable in size. Throughout 2017 and 2018, Dr. Person continued to treat Mr. Lane for his acute problems and complaints of pain. He consistently prescribed Tylenol for his chronic headaches. In providing treatment to Mr. Lane, Dr. Person took into consideration that Mr. Lane's condition hadn't changed over time, his acoustic neuroma was benign and had been present since 1997, and none of the medical records contained a treatment plan to indicate he should have surgery to remove the tumor. Dr. Person's care of Mr. Lane ended in early 2019, when he stopped working as an Advanced Correctional Healthcare physician at the jail.

Dr. Nelson, the only medical expert in this case apart from Dr. Person, opined that Dr. Person rendered medical treatment consistent with the standard of care. Dr. Nelson stated that, as a primary care physician, Dr. Person reasonably relied on the assessments of Dr. Wangstrom and the neurosurgeon who determined Mr. Lane did not need surgery while he was at LaPorte County Jail. He further opined that it was reasonable for Dr. Person to monitor Mr. Lane's acoustic neuroma by ordering serial MRIs and examining Mr. Lane. Dr. Nelson said that it was also reasonable for Dr. Person to conclude that surgery wasn't warranted because the five MRIs in 2017 and 2018 indicated the tumor was relatively stable. Dr. Nelson stated that it wasn't until 2019, when the tumor had slightly increased in size that surgery would be considered as a treatment option. He also opined that, while it was appropriate to remove the tumor in 2019, there was no medical reason that indicated it should have been removed earlier. Dr. Nelson further explained that if he hadn't performed Mr. Lane's surgery in 2019, and had recommended monitoring his tumor, his care would have satisfied the standard of care for Mr. Lane's condition.

Given the record and totality of the circumstances in this case, no reasonable trier of fact could conclude that Dr. Person's medical care was objectively unreasonable. Dr. Person provided comprehensive and reasoned care by requesting and reviewing Mr. Lane's medical records, examining Mr. Lane on multiple occasions, prescribing pain medication, consulting with Dr. Mitcheff about a treatment plan, ordering five MRI scans, sending Mr. Lane to Dr. Wangstrom for an ENT consultation and audiology testing, and referring Mr. Lane for a neurosurgery consultation. That

Mr. Lane disagreed with Dr. Person's course of treatment and believed that surgery was the appropriate treatment doesn't establish that the treatment Dr. Person provided to Mr. Lane was objectively unreasonable. Williams v. Ortiz, 937 F.3d 936, 944 (7th Cir. 2019) (that staff did not prescribe desired pain medication or provide mattress to inmate did not mean the course of treatment was objectively unreasonable); Forbes v. Edgar, 112 F.3d 262, 267 (7th Cir. 1997) (a prisoner is not entitled to demand specific care, nor is he entitled to the "best care possible."). Whether Mr. Lane was scheduled to have surgery before he entered LaPorte County Jail is immaterial: the record establishes he received constitutionally appropriate medical care while he was incarcerated at the LaPorte County Jail.

Given the extensive medical record detailing the reasoned medical attention and care Mr. Lane received from Dr. Person, no reasonable fact finder could find on this record that Dr. Person's medical care was objectively unreasonable, and that Dr. Person violated Mr. Lane's constitutional rights. Accordingly, Dr. Person's motion for summary judgment will be granted.

## B. Motions for Sanctions

Mr. Lane has filed two motions for sanctions against Dr. Person and his counsel. Mr. Lane alleges that Dr. Person's motion for summary judgment was filed in "deception by the Defense to prolong and deceive this Court" and his motion to compel was "another [p]lot [by the defense] to deceive this court." Mr. Lane's motions assert that defense counsel provided a false statement to this court by representing

that Dr. El-Kashlan didn't recommend surgery to remove his acoustic neuroma. The court's review of the record shows that defense counsel correctly represented what is contained in Dr. El-Kashlan's March 2016, treatment note. Dr. El-Kashlan's treatment note documents the various treatment options, including the risks associated with different surgical options, that he discussed with Mr. Lane. Dr. El-Kashlan also referred Mr. Lane for a neurosurgery consultation and additional testing. But Mr. Lane never followed through on any of Dr. El-Kashlan's treatment recommendations because, for various reasons, he cancelled his appointments. Mr. Lane hasn't described any conduct on the part of Dr. Person or his counsel that warrants the imposition of sanctions. Therefore, these motions will be denied.

## IV.   CONCLUSION

For the reasons, the court:

(1) GRANTS Defendant's Motion for Summary Judgment (ECF 89),

(2) DENIES Plaintiff's Motion to Dismiss Summary Judgment (ECF 96);

(3) DENIES Plaintiff's Motion for Formal Complaint and Sanctions against the Defendant and his Counsel (ECF 112);

(4) DENIES Plaintiff's Motion for Sanctions against the Defendant and his Counsel (ECF 114); and

(5) DIRECTS the Clerk to enter judgment in favor of Defendant Dr. Michael Person and CLOSE this case.

SO ORDERED on March 22, 2021

s/ Robert L. Miller, Jr.
JUDGE
UNITED STATES DISTRICT COURT